**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GRYPHON DIGITAL MINING, INC., | CASE NO. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| K&L GATES LLP and ROBERT HONEYWELL, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Gryphon Digital Mining, Inc. ("Gryphon"), by and through its attorneys, brings this Complaint against Defendants K&L Gates LLP ("K&L Gates") and Robert Honeywell ("Mr. Honeywell") (together, "Defendants"), and alleges as follows:

**NATURE OF THE CASE**

1.      K&L Gates is a global law firm with more than 1,700 attorneys worldwide. According to the National Law Journal, in 2024, K&L Gates was the 14th largest firm in the United States.

2.      K&L Gates prides itself on its "Restructuring and Insolvency" services, and its website claims that at least 139 of its attorneys specialize in this area.

3.      The firm publicly boasts of its "Restructuring and Insolvency" expertise.  It claims to "regularly represent debtors" across the globe, which "enables [it] to provide coordinated cross-border restructuring advice to [its] clients."  It further states that "bankruptcy" and litigation in bankruptcy courts are two of the Restructuring and Insolvency group's "core competencies."

4.      Unfortunately, Gryphon found out the hard way that these representations vastly overstated K&L Gates' qualifications.  K&L Gates failed to file a simple proof of claim form on

Gryphon's behalf—the most basic step in a bankruptcy—in a multi-million dollar bankruptcy. What's worse, when Gryphon asked whether such a form should have been filed, K&L Gates doubled down and repeatedly failed to file the proof of claim.

5.    Ultimately, Gryphon retained another law firm to replace K&L Gates, which quickly and correctly identified that a proof of claim needed to be filed.  But by that time it was nearly one year since K&L Gates became involved with the bankruptcy proceeding, and the damage was done.

6.    As detailed below, K&L Gates' repeated failure to file a simple proof of claim form, despite repeated requests from Gryphon, resulted in Gryphon suffering millions of dollars of financial harm.  Gryphon brings this case in order to recover the losses it needlessly suffered due to K&L Gates' malpractice.

7.    Equally troubling is the manner in which K&L Gates billed Gryphon for the legal work it actually claimed to provide.  Although it was asleep at the switch regarding Gryphon's bankruptcy obligations, K&L Gates treated Gryphon like a cash cow in connection with other advisory work.

8.    Gryphon retained K&L Gates to advise on various transactions and draft master services agreements between Gryphon and two other companies.  Although these are fairly routine tasks, especially for a firm of K&L Gates' size, K&L Gates utilized predatory and improper billing practices that resulted in extensive and unnecessary fees.  For example, K&L Gates used at least **84 different attorneys**, and assigned to high-billing partners tasks that should have been performed at the associate level.

9.    To make matters worse, K&L Gates excessively billed time on various tasks, and submitted vague, duplicative time entries to Gryphon that have not been explained to this day,

despite Gryphon's requests.  These improper billing practices resulted in Gryphon being overcharged by more than one million dollars.  Gryphon brings this suit to also recover these sums and to hold K&L Gates accountable for its breaches of contract and violations of ethical duties owed to Gryphon.

## PARTIES

10.     Plaintiff Gryphon Digital Mining, Inc. is a corporation that is incorporated in the state of Delaware with its principal place of business in Nevada.

11.     Defendant K&L Gates LLP is a limited liability partnership organized under the laws of Delaware, and is headquartered in Pennsylvania, with offices worldwide, including New York City, New York.

12.     Defendant Robert Honeywell is an individual who is a partner at K&L Gates' New York office and is part of the firm's Restructuring and Insolvency group.  Upon information and belief, Mr. Honeywell resides in New York City, New York.  At all relevant times, Mr. Honeywell was an employee or agent of K&L Gates who acted within the scope of his agency or employment relationship and in furtherance of K&L Gates' business interests, and therefore his conduct is imputed to K&L Gates.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between the parties, and the amount in controversy is in excess of $75,000.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, for numerous reasons. The matter for which Gryphon originally retained K&L Gates involved a New York contract, was subject to New York law, and resulted in a lawsuit against Gryphon in the Southern District of New York through which Gryphon suffered harm due to K&L Gates' malpractice.

Additionally, Robert Honeywell, the bankruptcy practitioner K&L Gates identified as the individual to advise Gryphon regarding the bankruptcy, is a New York practitioner who works out of K&L Gates' New York office and provided Gryphon with bankruptcy advice from that location.

## FACTUAL ALLEGATIONS

**A.     Gryphon Retains K&L Gates to Advise on a Contract Between Gryphon and Sphere 3d Corp.**

15.     Gryphon is a privately-held bitcoin mining company and industry leader in environmentally responsible bitcoin mining.

16.     Bitcoin is a decentralized digital currency (or "cryptocurrency") that can be stored on, and transferred among, digital wallets via peer-to-peer transactions.

17.     Bitcoin mining is the process of applying computing power to solve cryptographic problems to produce or "mint" new bitcoins, a process that is "energy intensive."

18.     Bitcoin miners who operate at a large scale typically either operate their own facilities, or contract with a hosting provider who will provide low-cost electricity to power those bitcoin mining computers, and will host and operate those bitcoin mining computers for a fee.

19.     Most bitcoin miners will direct their mining computers to a bitcoin mining pool, which aggregates the bitcoin mining power of various miners together, and pays miners *pro rata* based on a miner's contribution to the overall production of all mining computers participating in the pool.

20.     Sphere 3d Corp. ("Sphere") is another cryptocurrency mining company.

21.     On or around June 3, 2021, Sphere announced a planned merger with Gryphon, to be closed in the third quarter of 2021.

22.     On or about August 5, 2021, Sphere announced that it had assumed and executed

an agreement pursuant to which it would purchase 60,000 new bitcoin mining machines. Sphere repeatedly touted the anticipated mining capacity it and Gryphon would have following the anticipated merger, resulting from the 60,000 machines Sphere would contribute and the 7,200 machines Gryphon would contribute to the newly formed company.

23.     In anticipation of this eventual merger, Gryphon and Sphere entered into a Master Services Agreement ("Sphere MSA").

24.     Gryphon retained K&L Gates to advise it regarding the Sphere MSA and related issues and, on August 12, 2021, formally signed a retainer agreement with K&L Gates.

25.     As part of the Sphere MSA, Sphere agreed to provide Gryphon with $35 million related to cryptocurrency mining work.

26.     Although Sphere and Gryphon abandoned their plans for a merger in early 2022, the Sphere MSA regarding the cryptocurrency mining to be performed by Gryphon remained in effect.

**B.     Gryphon Enters a Separate Agreement With Core Scientific, Inc. to Host the Cryptocurrency Mining Work.**

27.     As noted above, a common practice in the cryptocurrency mining industry is for a mining company, like Gryphon, to contract with a hosting provider who provides power and hosting services for the computers used to perform the mining work.

28.     To that end, on or about September 12, 2021, Core and Gryphon entered into their own Master Services Agreement (the "Core MSA"), whereby Core agreed to build out and provide hosting services for the cryptocurrency mining work.

29.     Pursuant to the Core MSA, Gryphon agreed to provide Core with the $35 million it received from Sphere in exchange for Core providing, *inter alia*, the infrastructure to host 71,000 Gryphon cryptocurrency mining machines.

30.     Although Sphere was at all times aware of, and assented to, the Core MSA, it was not a signatory to that agreement.  The only signatories were Gryphon and Core.

31.     K&L Gates also advised Gryphon on the Core MSA, and was at all times aware of, and privy to, the inner workings of the relationship among Gryphon, Sphere, and Core.

**C.     Litigation Ensues: Core Files for Bankruptcy Relief, and Sphere Sues Gryphon.**

32.     On December 5, 2022, Core filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.  *See In re Core Scientific, Inc., et al.*, Case No. 22-90341 (CML), in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "Core Bankruptcy").

33.     In April 2023, Sphere sued Gryphon in the United States District Court for the Southern District of New York where it alleged, *inter alia*, that Gryphon breached various terms of the Sphere MSA.  *See Sphere 3d Corp. v. Gryphon Digital Mining, Inc.*, Case No. 1:23-cv-02954 (Castel, J.) (the "S.D.N.Y. Litigation")  As detailed further below, the S.D.N.Y. Litigation has since settled.

34.     At the time of its original filing, Sphere's complaint against Gryphon did not include any claims related to the Core Bankruptcy.  Unfortunately, due to K&L Gates' missteps, that would change.

**D.     K&L Gates Offers to Advise Gryphon Regarding the Core Bankruptcy.**

35.      On December 22, 2022, Andrew Hinkes, a partner at K&L Gates, e-mailed Gryphon regarding the Core Bankruptcy, and asked whether Gryphon would like K&L Gates to provide legal advice regarding the same.  Specifically, Mr. Hinkes wrote:

> "I'm sure you saw that Core filed for relief under Ch.11 of the Bankruptcy Code and is seeking to reorg its outstanding debt obligations. I'm not sure if you still have hosting relationships with Core or otherwise have any

dealings with them, but if you have any questions as to how their filing may affect you, please let me know – I'd be happy to set up some time for you to chat with our insolvency folks."

36.    K&L Gates connected Gryphon with bankruptcy partner Robert Honeywell, who K&L Gates claimed was "experienced with bankruptcy matters involving crypto[currency]." In reliance upon K&L Gates' claimed subject-matter expertise in the bankruptcy field, and due to K&L Gates' underlying knowledge of the Sphere MSA and Core MSA, Gryphon accepted K&L Gates' invitation for counsel. Gryphon and K&L Gates did not enter into a new representation agreement for the work related to the Core Bankruptcy. K&L Gates undertook this work under the same retainer agreement through which it advised Gryphon on the Sphere MSA and Core MSA.

37.    But instead of Mr. Honeywell, who specializes in bankruptcy matters, the initial analysis of the Core Bankruptcy and its potential impact on Gryphon was performed by Mikal Shaikh, a partner who specializes in securities law but who does not specialize in bankruptcy. Mr. Shaikh's non-specialization in bankruptcy was never disclosed to Gryphon.

38.    According to billing records provided by K&L Gates to Gryphon, Mr. Honeywell did not spend any time looking at the Core Bankruptcy in December 2022. The only two billing entries are from Mr. Shaikh (again, a non-bankruptcy specialist) as follows:

> Dec. 29, 2022—Research and analyze issues regarding Core bankruptcy; telephone conferences regarding same.

> Dec. 30, 2022—Research and analyze issues regarding Core bankruptcy; telephone conferences with client regarding same.

**E.    K&L Gates Fails to Monitor the Core Bankruptcy and Misses the Deadline to File a Proof of Claim.**

39.    K&L Gates' billing records show that the firm took no further action regarding the Core Bankruptcy for more than five months. During that time, however, critical

developments occurred in the bankruptcy that K&L Gates missed.

40.     On March 9, 2023, Core sought a bar date by which all creditors or interested parties were required to file proofs of claim in the bankruptcy.

41.     A proof of claim is a form document that is routinely filed in a bankruptcy in order to preserve the rights of creditors, or other parties, to potentially recover from a debtor.  It serves many purposes, such as preserving a party's entitlement to certain priority, as well as the amount of any potential claim by that creditor or party.

42.     Simply put, a proof of claim is one of the simplest and most routine filings in any bankruptcy proceeding.  Even where there may be uncertainty as to whether a party has a recoverable claim, proofs of claim are routinely filed out of an abundance of caution simply to preserve a party's rights.  It is Bankruptcy 101.

43.     The bankruptcy court set a proof of claim bar date of April 14, 2023, by which all proofs of claim needed to be filed.

44.     K&L Gates did not advise Gryphon of the proof of claim bar date.

45.     K&L Gates did not file a proof of claim on Gryphon's behalf.

46.     Sphere, however, filed a $35 million proof of claim, even though it did not have any direct contract with Core.

**F.      Gryphon Subsequently Asks K&L Gates Whether it Needed to File a Proof of Claim But K&L Gates Never Files.**

47.     On May 9, 2023, Core objected to Sphere's proof of claim and argued that Sphere lacked standing to make such a filing.  Core instead asserted that, if any party was to have filed a proof of claim, it should have been Gryphon, because Gryphon was the only party in privity with Core under the Core MSA.

48.     On May 10, 2023, Gryphon e-mailed K&L Gates attorney Mr. Hinkes and alerted

him to Core's objection.  Gryphon instructed Mr. Hinkes that, if Gryphon were indeed supposed

to file a proof of claim, K&L Gates needed to do so promptly.

49.     That same day, Mr. Hinkes responded to Gryphon and stated that K&L Gates

would "get one of our insolvency partners to take a look at this."

50.     K&L Gates' billing records indicate that this was the ***first time*** that K&L Gates

performed any analysis whatsoever regarding whether Gryphon needed to file a proof of claim in

the bankruptcy—one month after the proof of claim bar had passed.

51.     Indeed, according to those same records, it was not until May 11, 2023 (again,

after the proof of claim bar) that Mr. Honeywell became involved in the case at all.  On May 11,

2023, Mr. Honeywell billed time for correspondence related to "strategy for filing bankruptcy

claim against Core Scientific."  He had a similar entry on May 12, 2023, and on May 15, 2023,

he billed for a client call regarding K&L Gates' advice on the proof of claim issue.

52.     Ultimately, no claim was ever filed despite Gryphon's request to "please have this

done," if necessary.

**G.     K&L Gates Continues Not to Monitor the Core Bankruptcy.**

53.     On June 9, 2023, Core filed a Motion for Summary Judgment on Sphere's proof

of claim.

54.     On August 7, 2023, the bankruptcy court held a hearing on Core's summary-

judgment motion.

55.     Although this motion potentially impacted Gryphon's rights as the party in privity

with Core, no one from K&L Gates, including Mr. Honeywell, attended that summary-judgment

hearing on Gryphon's behalf, even in a monitoring capacity.

56.     At the hearing, the bankruptcy judge questioned why Gryphon had not been an

active participant in the Core Bankruptcy, going so far as to ask "do we need to join [Gryphon]?"

57.     The bankruptcy court recognized that the proof of claim bar date had passed.  The judge expressed his displeasure that Gryphon had not filed a proof of claim, stating: "I thought they were going to do it right and they didn't."

58.     Nevertheless, the judge indicated that Gryphon could request to file a late proof of claim in the interest of judicial economy, as he wanted all issues resolved in a single action.

59.     But because K&L Gates did not attend the hearing to protect Gryphon's interests, it did not hear the bankruptcy court's invitation to file a late proof of claim, and therefore never informed Gryphon of this option in order to protect Gryphon's interests.  Gryphon only learned of this months later, when its new counsel obtained the hearing transcript.

60.     K&L Gates never filed a proof of claim on Gryphon's behalf.

**H.     Core Files an Adversary Complaint Against Gryphon and Sphere.**

61.     On November 21, 2023, Core filed an adversary complaint in the Core Bankruptcy against Gryphon and Sphere, alleging more than $100 million in damages for breach of the Core MSA and other agreements.

62.     Due to K&L Gates' repeated lack of involvement and mishandling of the Core Bankruptcy, Gryphon retained Hogan Lovells as new counsel.

63.     Hogan Lovells immediately, and correctly, realized that Gryphon needed to file a proof of claim in the Core Bankruptcy, which K&L Gates repeatedly refused to do for unknown reasons.

64.     In December 2023, Gryphon's new counsel swiftly moved for leave to file a late proof of claim.

65.     By that time, K&L Gates had been aware of the Core Bankruptcy for one year,

but never took any material steps to protect Gryphon's rights.

66.    Shortly after Gryphon filed its motion for leave to file a late proof of claim,

Sphere and Core agreed to a settlement of the dispute over the validity of Sphere's proof of

claim.  This settlement included Core dismissing its $100 million adversary claims against

Sphere and Gryphon.  As part of that settlement, Sphere agreed to accept a reduced payment of

$10 million on its $35 million proof of claim, due to the unnecessary uncertainty caused by K&L

Gates' failure to file a proof of claim for Gryphon.  The Core Bankruptcy plan provided for

payment in full for Core's unsecured creditors, like Sphere and Gryphon.

    **I.**    **Sphere Amends its Complaint Against Gryphon, Citing Gryphon's Failure to File a Proof of Claim in the Core Bankruptcy.**

67.    While all of the above was going on, on September 20, 2023, Sphere filed a

Second Amended Complaint in the S.D.N.Y. Litigation.  That complaint alleged, among other

things, that Gryphon breached its fiduciary duty against Sphere by failing to protect Sphere's

rights in the bankruptcy.

68.    Specifically, Sphere alleged that "[Gryphon] failed to file a proof of claim in a

pending bankruptcy proceeding in which Sphere has a substantial claim, jeopardizing Sphere's

ability to pursue its claim because Gryphon interacted with the debtor on Sphere's behalf."

69.    Thus, K&L Gates' repeated inaction in the Core Bankruptcy exposed Gryphon to,

at minimum, approximately $24 million of unnecessary exposure that Gryphon needed to

contend with for the remainder of the S.D.N.Y. Litigation.

    **J.**    **Sphere and Gryphon Settle the S.D.N.Y. Litigation.**

70.    Sphere and Gryphon continued to pursue the S.D.N.Y Litigation into 2025.

71.    During the course of the S.D.N.Y. Litigation, Gryphon pursued its own

counterclaims against Sphere, alleging that Sphere—not Gryphon—was the party that breached

the Sphere MSA.  Gryphon's counterclaims sought monetary damages from Sphere for millions of dollars, including lost profits.

72.     All the while, the specter of Sphere's $24 million fiduciary duty claim loomed over Gryphon's head due to K&L Gates' repeated failure to protect Gryphon's interests in the Core Bankruptcy.

73.     In March 2025, the parties settled the S.D.N.Y. Litigation, which was voluntarily dismissed on March 12, 2025.

74.     Gryphon was forced to forego millions of dollars in valuable counterclaims in exchange for resolving Sphere's $24 million breach of fiduciary duty claim that arose from K&L Gates' mistake.

75.     Gryphon suffered tremendously due to K&L Gates' mishandling of the Core Bankruptcy.  On the other hand, K&L Gates profited tremendously from its representation of Gryphon.

**K.     Adding Further Insult to Injury, K&L Gates' Improper Billing Practices Cost Gryphon Even More Money.**

76.     Although K&L Gates was asleep at the switch with respect to the Core Bankruptcy, it made sure to continually bill Gryphon for work it allegedly performed related to the Sphere MSA and Core MSA.

77.     K&L Gates' billing practices were improper and breached not only the terms of its engagement agreement with Gryphon, but also the ethical duties owed by K&L Gates to Gryphon.

78.     In its August 12, 2021, engagement agreement with Gryphon, K&L Gates represented that it would staff its matter with "other partners, associates and other professional

staff **as may be appropriate** under the circumstances." (Emphasis added.)

79.     K&L Gates' staffing of its representation of Gryphon was anything but appropriate.  Although the representation sought standard legal advice on issues such as the Sphere MSA, K&L Gates used the representation to throw scores of attorneys at the file.  By the time the representation concluded, K&L Gates had assigned at least **84 attorneys** to its representation of Gryphon.

80.     K&L Gates did not communicate this swelling number of attorneys to Gryphon, despite its representation in its engagement agreement that it would keep Gryphon "apprised of significant developments in the course of our engagement, to consult with you about our work on an ongoing basis and to obtain your direction on critical issues."

81.     Nor did K&L Gates communicate how the attorneys on its cases were being utilized.  K&L Gates routinely had high-billing partners perform work that should have been performed by associates who billed at lower rates.

82.     Making matters worse, K&L Gates needlessly inflated the amount of time spent on routine tasks, and excessively billed for other mundane, duplicative work, such as interoffice communications.

83.     The billing entries submitted by K&L Gates to justify its mammoth bills were themselves improper and, at times, inscrutable.  K&L Gates repeatedly utilized inappropriate billing practices such as vague entries, block billing, rounded hours, and repetitious narratives. This made it impossible for Gryphon to understand what exactly, if anything, formed the basis of K&L Gates' bills.  Gryphon has sought clarification regarding these issues but, to date, has received none.

84.     K&L Gates' improper billing practices ultimately resulted in more than $2.7

million in legal fees to Gryphon.  The majority of these fees were unnecessary and are not supported by any proper accounting or billing records.

85.    K&L Gates owed its client, Gryphon, duties of competence, diligence, loyalty, and due care.

86.    K&L Gates owed Gryphon a duty to act in good faith and fair dealing.

87.    K&L Gates owed Gryphon a duty to communicate.

88.    K&L Gates failed to exercise loyalty, competence, and due care in its representation of Gryphon.

89.    K&L Gates failed to act in good faith and with fair dealing in its representation of Gryphon.

90.    K&L Gates failed to communicate with Gryphon in that it did not explain or advise Gryphon of its burgeoning legal fees.

91.    K&L Gates charged legal fees that were excessive and unjustified based on the hours worked and the complexity of Gryphon's matters.

92.    K&L Gates' unnecessary use of excessive numbers of lawyers, excessive time on routine tasks, and inappropriate billing practices resulted in artificial and unnecessary billing to its client.

93.    K&L Gates' inappropriate use of billing practices resulted in Gryphon's inability to monitor K&L Gates' legal work and charges for legal services.

94.    Gryphon sustained financial burden and suffered damages due to K&L Gates' failure to exercise loyalty, competence and due care in that Gryphon was charged for and paid excessive attorneys' fees for the legal services provided by K&L Gates.

95.    Gryphon sustained financial burden and suffered damages due to K&L Gates'

failure to act in good faith and with fair dealing in that Gryphon was charged for and paid excessive attorneys' fees for the legal services provided by K&L Gates.

96.     K&L Gates was negligent in its dealings with Gryphon.

97.     K&L Gates breached its engagement agreement with Gryphon.

98.     Through its breaches of duties owed to Gryphon, K&L Gates committed legal malpractice.

99.     Underscoring the absurdity of Gryphon's entire representation with K&L Gates is this bitter reality: despite throwing more than 84 attorneys at Gryphon's file, not one of those attorneys ever thought to file a proof of claim on Gryphon's behalf in the Core Bankruptcy.

## CAUSES OF ACTION

## COUNT 1—LEGAL MALPRACTICE

### (AGAINST ALL DEFENDANTS)

100.    Gryphon incorporates by reference all the allegations of Paragraphs 1–99 as if they were fully set forth herein.

101.    Defendants' actions, or inactions, related to the Core Bankruptcy on Gryphon's behalf are legal malpractice.

102.    Defendants owed a duty of care to their client, Gryphon, to provide quality legal representation to Gryphon and protect Gryphon's interests.

103.    Defendants owed Gryphon a duty of undivided loyalty, and were not permitted to put any interest ahead of their client's interests, including and especially K&L Gates' own financial interests.

104.    Defendants owed Gryphon a duty of competence, meaning Defendants were required to possess the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

105.    Defendants owed Gryphon a duty to communicate, including to apprise Gryphon of "material developments in the matter"; to "reasonably consult with [Gryphon] about the means by which [Gryphon's] objectives are to be accomplished"; to keep Gryphon reasonably informed about the status of the representation; to promptly comply with any of Gryphon's requests for information; and to promptly apprise Gryphon of any limitations on K&L Gates' behalf.

106.    Defendants owed Gryphon a duty of diligence, and were required to act with promptness and to "not neglect" the representation entrusted by Gryphon to K&L Gates.

107.    Defendants breached their duties to Gryphon.

108.    Defendants breached their duties of care, competence, and diligence by, among other things: failing to monitor the Core Bankruptcy; failing to advise Gryphon of key events in the Core Bankruptcy; failing to timely file a proof of claim on Gryphon's behalf; failing to file a proof of claim after Gryphon requested that K&L Gates do so; failing to attend hearings in the Core Bankruptcy to protect Gryphon's interests; and related missteps.

109.    Defendants failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.  Any other reasonable counsel in Defendants' position would have paid attention to deadlines in the Core Bankruptcy, attended key hearings, and kept Gryphon apprised of proceedings that could have affected Gryphon's rights.  And any other reasonable counsel certainly would have filed a proof of claim, which is a simple step in any bankruptcy.  This is especially true where Defendants were in a unique position due to their familiarity with the relationship among Sphere, Core, and Gryphon.  But Defendants took no action for a year and ignored Gryphon's inquiry to file a proof of claim.

110.    Defendants' inaction fell well below the standard of care.  Any competent

bankruptcy attorney would have known to file a simple proof of claim form and attend hearings where a client's rights may be implicated.

111.    K&L Gates also breached its duties of utmost loyalty and communication by failing to apprise Gryphon of key occurrences in the Core Bankruptcy, and through its improper and unjustified billing practices.  K&L Gates kept Gryphon in the dark as to how it was billing Gryphon, the extreme number of attorneys assigned to the file, what work those attorneys were doing and, when asked, did not provide an explanation for its billing practices.

112.    Defendants' malpractice resulted in Gryphon suffering significant damages and was the proximate and but-for cause of those damages.  Sphere weaponized K&L Gates' failure to file a proof of claim into a $24 million breach of fiduciary duty claim against Gryphon in the S.D.N.Y. Litigation.  This presented at least $24 million of unnecessary exposure to Gryphon in a case where Gryphon asserted meritorious claims for damages against Sphere.  This added risk forced Gryphon to compromise its positions during settlement, and to abandon valuable claims against Sphere upon which it otherwise would have prevailed.

113.    Additionally, K&L Gates' malpractice with respect to its improper billing practices resulted in Gryphon being overcharged at least one million dollars in additional unnecessary fees that it should not have had to pay, and which remain inadequately accounted for to this day.

114.    Gryphon's damages due to Defendants' legal malpractice include, but are not limited to: the lost value of the counterclaims it abandoned against Sphere in the S.D.N.Y. Litigation in order to protect itself with the risk presented by Sphere's $24 million claim; attorneys' fees and costs incurred by Gryphon in the S.D.N.Y. Litigation for defending against that claim; attorneys' fees and costs incurred for Defendants' negligent work during the Core

Bankruptcy; attorneys' fees and costs incurred for Gryphon being forced to pursue this action; the unnecessary fees and costs Gryphon incurred due to K&L Gates' improper billing practices; and other recoverable damages, all of which will be proven in an amount to be established at trial. But for Defendants' legal malpractice, Gryphon would not have incurred any of these damages.

## COUNT 2—NEGLIGENCE

### (AGAINST ALL DEFENDANTS)

115.    Gryphon incorporates by reference all the allegations of Paragraphs 1–114 as if they were fully set forth herein.

116.    Defendants' basic failure to file a proof of claim on Gryphon's behalf is textbook negligence.

117.    Defendants owed a duty of care to their client, Gryphon, to provide quality legal representation to Gryphon and protect Gryphon's interests. As detailed above, they likewise owed Gryphon duties of competence, diligence, communication, and loyalty.

118.    Defendants breached their duties by, among other things: failing to monitor the Core Bankruptcy; failing to advise Gryphon of key events in the Core Bankruptcy; failing to timely file a proof of claim on Gryphon's behalf; failing to file a proof of claim after Gryphon requested that Defendants do so; failing to attend hearings in the Core Bankruptcy to protect Gryphon's interests and related missteps; failing to staff and apply proper oversight to its representation of Gryphon; failing to ensure Gryphon was not being overcharged for duplicative or unnecessary work; and a failure to keep Gryphon apprised of unchecked and burgeoning legal fees.

119.    Any other reasonable counsel in Defendants' position would have paid attention to deadlines in the Core Bankruptcy, attended key hearings, and kept Gryphon apprised of

proceedings that could have affected Gryphon's rights.  And any other reasonable counsel certainly would have filed a proof of claim, which is a simple step in any bankruptcy.  This is especially true where Defendants were in a unique position due to their familiarity with the relationship among Sphere, Core, and Gryphon.  But Defendants took no action for a year and ignored Gryphon's inquiry to file a proof of claim.

120.    Defendants' inaction fell well below the standard of care.  Any competent bankruptcy attorney would have known to file a simple proof of claim form and attend hearings where a client's rights may be implicated.

121.    Likewise, any other reasonable counsel in K&L Gates' position would not have assigned more than 84 attorneys to a routine representation, would have ensured it used complete and accurate billing practices, would not have assigned partners with high billing rates to do associate-level work, and would have ensured that its client was not being overbilled by more than one million dollars.

122.    Defendants' breaches resulted in Gryphon suffering significant damages and was the proximate and but-for cause of those damages.  Sphere weaponized Defendants' failure to file a proof of claim into a breach of fiduciary duty claim against Gryphon in the S.D.N.Y. Litigation.  This presented at least $24 million of unnecessary exposure to Gryphon in a case where Gryphon asserted meritorious claims for damages against Sphere.  This added risk forced Gryphon to compromise its positions during settlement, and to abandon valuable claims against Sphere upon which it otherwise would have prevailed.

123.    Additionally, K&L Gates' negligence with respect to its improper billing practices resulted in Gryphon being overcharged at least one million dollars in additional unnecessary fees that it should not have had to pay, and which remain inadequately accounted

for to this day.

124.     Gryphon's damages due to Defendants' negligence include, but are not limited to: the lost value of the counterclaims it abandoned against Sphere in the S.D.N.Y. Litigation in order to protect itself with the risk presented by Sphere's $24 million claim; attorneys' fees and costs incurred by Gryphon in the S.D.N.Y. Litigation for defending against that claim; attorneys' fees and costs incurred for Defendants' negligent work during the Core Bankruptcy; attorneys' fees and costs incurred for Gryphon being forced to pursue this action; the unnecessary fees and costs Gryphon incurred due to K&L Gates' improper billing practices; and other recoverable damages, all of which will be proven in an amount to be established at trial.  But for Defendants' negligence, Gryphon would not have incurred any of these damages.

## COUNT 3—BREACH OF FIDUCIARY DUTY

### (AGAINST ALL DEFENDANTS)

125.     Gryphon incorporates by reference all the allegations of Paragraphs 1–124 as if they were fully set forth herein.

126.     As Gryphon's legal counsel, Defendants were in a fiduciary relationship with Gryphon.  Defendants repeatedly failed to satisfy their fiduciary obligations.

127.     At all times, Defendants should have been aware of their obligation to file a proof of claim on Gryphon's behalf in the Core Bankruptcy.

128.     Even assuming Defendants did not initially know that they should have filed a proof of claim on Gryphon's behalf, Gryphon brought the issue to Defendants' attention on May 10, 2023, and asked that Defendants file a proof of claim if necessary.  Instead of admitting their mistake, Defendants doubled down on their failure to file a proof of claim, to Gryphon's detriment.  In failing to admit their mistake and take corrective action, Defendants violated the utmost duty of loyalty that an attorney owes a client pursuant to the attorney-client relationship.

129.    Defendants' breaches resulted in Gryphon suffering significant damages and was the proximate and but-for cause of those damages.  Sphere weaponized Defendants' failure to file a proof of claim into a breach of fiduciary duty claim against Gryphon in the S.D.N.Y. Litigation.  This presented at least $24 million of unnecessary exposure to Gryphon in a case where Gryphon asserted meritorious claims for damages against Sphere.  This added risk forced Gryphon to compromise its positions during settlement, and to abandon valuable claims against Sphere upon which it otherwise would have prevailed.

130.    Defendants' inaction fell well below the standard of care.  Any competent bankruptcy attorney would have known to file a simple proof of claim form and attend hearings where a client's rights may be implicated.

131.    Likewise, K&L Gates' improper billing practices, such as its over-assignment of lawyers to the file, excessive billing, vague and improper billing entries, and similar actions are a breach of K&L Gates' fiduciary duty as the firm put its own pecuniary interest ahead of its utmost fiduciary duties to its client.

132.    Gryphon's damages due to Defendants' breaches include, but are not limited to: the lost value of the counterclaims it abandoned against Sphere in the S.D.N.Y. Litigation in order to protect itself with the risk presented by Sphere's $24 million claim; attorneys' fees and costs incurred by Gryphon in the S.D.N.Y. Litigation for defending against that claim; attorneys' fees and costs incurred for Defendants' negligent work during the Core Bankruptcy; attorneys' fees and costs incurred for Gryphon being forced to pursue this action; the unnecessary fees and costs Gryphon incurred due to K&L Gates' improper billing practices; and other recoverable damages, all of which will be proven in an amount to be established at trial.  But for Defendants' breaches, Gryphon would not have incurred any of these damages.

## COUNT 4—BREACH OF CONTRACT

## (AGAINST ALL DEFENDANTS)

133.    Gryphon incorporates by reference all the allegations of Paragraphs 1–132 as if they were fully set forth herein.

134.    Defendants were subject to a retainer agreement through which they agreed to provide legal services to Gryphon in exchange for monetary compensation.

135.    K&L Gates certainly received its benefit of the bargain—collecting more than $2.7 million from Gryphon in connection with the representation for the Core and Sphere matters.  Gryphon, on the other hand, did not.

136.    For example, Defendants agreed to keep Gryphon "reasonably informed about the status of our engagements and promptly to comply with reasonable requests for information." They also stated that they would "endeavor to keep you apprised of significant developments in the course of our engagement, to consult with you about our work on an ongoing basis and to obtain your direction on critical issues."  They certainly did not do so—Defendants failed to advise Gryphon regarding the setting of the proof of claim bar date, failed to advise that it had not filed a proof of claim, failed to attend and apprise Gryphon of key hearings in the Core Bankruptcy, and so on.

137.    More broadly, Defendants simply never furnished to Gryphon the services they agreed to provide with respect to the Core Bankruptcy.  In December 2022, *K&L Gates reached out to Gryphon*, and offered to advise Gryphon on issues related to the Core Bankruptcy. Defendants offered the services of Mr. Honeywell, who they claimed had experience in cryptocurrency bankruptcies.  Given Defendants' knowledge of the Core and Sphere relationship, and their professed cryptocurrency bankruptcy expertise, Gryphon agreed.  But Defendants never provided any of the services they promised.  They didn't monitor the Core

Bankruptcy proceedings.  They made no filings to protect Gryphon's rights.  And their repeated inaction exposed Gryphon to millions of dollars in risk, for which Gryphon paid in the S.D.N.Y. Litigation.

138.    K&L Gates likewise did not honor its agreement with respect to its billing practices.  It failed to staff "appropriate" legal professionals on its representation, instead assigning at least 84 attorneys, many of whom were partners doing what should have been associate work.  And K&L Gates failed to communicate these issues to Gryphon; it did not apprise Gryphon of how the case was being staffed or the mounting legal bills.  It kept Gryphon completely in the dark.

139.    Defendants' breaches resulted in Gryphon suffering significant damages and was the proximate and but-for cause of those damages.  Sphere weaponized Defendants' failure to file a proof of claim into a breach of fiduciary duty claim against Gryphon in the S.D.N.Y. Litigation.  This presented at least $24 million of unnecessary exposure to Gryphon in a case where Gryphon asserted meritorious claims for damages against Sphere.  This added risk forced Gryphon to compromise its positions during settlement, and to abandon valuable claims against Sphere upon which it otherwise would have prevailed.

140.    Defendants' inaction fell well below the standard of care.  Any competent bankruptcy attorney would have known to file a simple proof of claim form and attend hearings where a client's rights may be implicated.

141.    Additionally, K&L Gates' breach with respect to its improper billing practices resulted in Gryphon being overcharged at least one million dollars in additional unnecessary fees that it should not have had to pay, and which remain inadequately accounted for to this day.

142.    Gryphon's damages due to Defendants' breaches include, but are not limited to:

the lost value of the counterclaims it abandoned against Sphere in the S.D.N.Y. Litigation in order to protect itself with the risk presented by Sphere's $24 million claim; attorneys' fees and costs incurred by Gryphon in the S.D.N.Y. Litigation for defending against that claim; attorneys' fees and costs incurred for Defendants' negligent work during the Core Bankruptcy; attorneys' fees and costs incurred for Gryphon being forced to pursue this action; the unnecessary fees and costs Gryphon incurred due to K&L Gates' improper billing practices; and other recoverable damages, all of which will be proven in an amount to be established at trial.  But for Defendants' breaches, Gryphon would not have incurred any of these damages.

<u>**COUNT 5—BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**</u>
**(AGAINST ALL DEFENDANTS)**

143.    Gryphon incorporates by reference all the allegations of Paragraphs 1–142 as if they were full set forth herein.

144.    In entering into an agreement with Gryphon, Defendants were bound by a covenant to act in good faith and fair dealing.

145.    Thus, regardless of whether Defendants' actions have breached any express terms of its engagement agreement or any other contract with Gryphon, Defendants nevertheless breached their covenant of good faith and fair dealing because they deprived Gryphon the fruits of those contracts.

146.    Defendants simply never furnished the services they agreed to provide to Gryphon with respect to the Core Bankruptcy.  In December 2022, *K&L Gates reached out to Gryphon*, and offered to advise Gryphon on issues related to the Core Bankruptcy.  Defendants offered the services of Mr. Honeywell, who they claimed had experience in cryptocurrency bankruptcies.  Given Defendants' knowledge of the Core and Sphere relationship, and their professed cryptocurrency bankruptcy expertise, Gryphon agreed.  But Defendants never provided

any of the services they promised. They didn't monitor the Core Bankruptcy proceedings. They made no filings to protect Gryphon's rights. And their repeated inaction exposed Gryphon to millions of dollars in risk, for which Gryphon paid in the S.D.N.Y. Litigation.

147.    K&L Gates likewise did not honor its agreement with respect to its billing practices. It failed to staff "appropriate" legal professionals on its representation, instead assigning at least 84 attorneys, many of whom were partners doing what should have been associate work. And K&L Gates failed to communicate these issues to Gryphon; it did not apprise Gryphon of how the case was being staffed or the mounting legal bills. It kept Gryphon completely in the dark.

148.    Defendants' breaches resulted in Gryphon suffering significant damages and was the proximate and but for cause of those damages. Sphere weaponized Defendants' failure to file a proof of claim into a breach of fiduciary duty claim against Gryphon in the S.D.N.Y. Litigation. This presented at least $24 million of unnecessary exposure to Gryphon in a case where Gryphon asserted meritorious claims for damages against Sphere. This added risk forced Gryphon to compromise its positions during settlement, and to abandon valuable claims against Sphere upon which it otherwise would have prevailed.

149.    Defendants' inaction fell well below the standard of care. Any competent bankruptcy attorney would have known to file a simple proof of claim form and attend hearings where a client's rights may be implicated.

150.    Additionally, K&L Gates' breaches with respect to its improper billing practices resulted in Gryphon being overcharged at least one million dollars in additional unnecessary fees that it should not have had to pay, and which remain inadequately accounted for to this day.

151.    Gryphon's damages due to Defendants' breaches include, but are not limited to:

the lost value of the counterclaims it abandoned against Sphere in the S.D.N.Y. Litigation in order to protect itself with the risk presented by Sphere's $24 million claim; attorneys' fees and costs incurred by Gryphon in the S.D.N.Y. Litigation for defending against that claim; attorneys' fees and costs incurred for Defendants' negligent work during the Core Bankruptcy; attorneys' fees and costs incurred for Gryphon being forced to pursue this action; the unnecessary fees and costs Gryphon incurred due to K&L Gates' improper billing practices; and other recoverable damages, all of which will be proven in an amount to be established at trial.  But for Defendants' breaches, Gryphon would not have incurred any of these damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court award the following relief:

(1)     For damages in an amount to be proven at trial;

(2)     For attorneys' fees and costs;

(3)     For pre-judgment and post-judgment interest; and

(4)     For any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all claims to which they are entitled to a trial by jury.  *See* Fed. R. Civ. P. 38.

DATED: April 14, 2025

MILLER BARONDESS, LLP

By: _____
    Lauren Brody
    SDNY Bar Code LC7756
    Justin P. Ehrlich
    (*Pro hac vice* pending)
    Steven G. Williamson
    (*Pro hac vice* pending)

2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
(310) 552-4400

Attorneys for Plaintiff
GRYPHON DIGITAL MINING, INC.

725051.2